UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| JOEL ROMERO, | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | Civil Action No. 3:26-cv-874 |
| v. | § | |
| | § | COMPLAINT |
| INTEGRITY MARKETING GROUP, | § | |
| | § | JURY REQUESTED |
| *Defendant.* | § | |
| | § | |

Plaintiff Joel Romero ("Plaintiff"), by his counsel, Harman Green, alleges for his Complaint

against Defendant Integrity Marketing Group ("Defendant") as follows:

## PRELIMINARY STATEMENT

1.    This case is about a retaliatory termination against Plaintiff following his

complaints of discrimination.

## JURISDICTION

2.    Pursuant to 28 U.S.C. §1331 this Court may properly hear Plaintiff's claims as they

arise under a federal statute.

3.    Plaintiff timely filed with the Equal Employment Opportunity Commission, Charge

No. 450-2026-04945, and received a Right to Sue letter on February 18, 2026.

## PARTIES

4.    Plaintiff was and is a resident of Texas.

5.    Defendant Integrity Marketing Group has a principal place of business at 1445 Ross

Avenue, 40th Floor, Dallas, Texas 75202.

## JURY DEMAND

6.    Plaintiff respectfully requests a trial by jury.

## STATEMENT OF FACTS

7.    In December 2024, Integrity reached out to Mr. Romero regarding an opportunity

1

to support the CFO, CMO, COO, CTO, CLO, and CBDO.

8. Mr. Romero was formally hired in February 2025.

9. His role was to drive two major initiatives: transforming the Finance and Technology functions of the enterprise.

10. During Mr. Romero's first 90 days, he observed that some colleagues, specifically Tabitha Pittman and Emma Loafman, were unwelcoming.

11. They frequently interrupted him and were combative in meetings.

12. Other individuals, particularly white colleagues, were not treated in this manner.

13. Despite these challenges, Mr. Romero successfully delivered a major project restructuring the Finance organization, which included managing the exit of a VP due to misconduct.

14. The CHRO, Rachelle McReynolds, and CFO, Linda Zukauckas, commended him for this work.

15. During this period, Tabitha Pittman began escalating minor issues to Ms. McReynolds, falsely accusing Mr. Romero of sending threatening communications.

16. Emma Loafman also began treating Mr. Romero differently, including gesturing to him in a demeaning manner and speaking to him as though he were her direct report.

17. In May 2025, Mr. Romero hired Peter Gulikers, who is white, as a direct report, following guidance from his leader, Cassey Bass, who preferred Mr. Gulikers over another candidate.

18. At a 90-day check-in in May, Ms. Bass conveyed feedback from Ms. Pittman and Ms. Loafman that Mr. Romero "did not work well with them" and "was creating wounds in the HR team."

19. Ms. Bass stated that he was overly focused on relationships with C-suite leaders

and personal visibility.

20.     This feedback was incorrect and completely unfair and meant to paint Mr. Romero in a bad light.

21.     In June 2025, during a conversation at the Integrity Club, Mr. Romero informed Ms. Bass that Ms. Pittman and Ms. Loafman were exhibiting racially insensitive behavior toward him, including microaggressions.

22.     Mr. Romero identified Ms. Loafman as the larger concern, as she was increasingly ignoring him and collaborating directly with Mr. Gulikers.

23.     Ms. Bass committed to addressing Ms. Loafman's behavior with her manager, Kipp Birwhistle, and followed up within a week, indicating the issue was resolved.

24.     Ms. Pittman's behavior was not formally addressed.

25.     The harassment grew worse after Mr. Romer's complaint, and it was clear that Defendant was actively trying to manufacture a basis for terminating him.

26.     In the same period, Mr. Romero learned from Ingrid Jones, during an engagement party at the Integrity Club, that there had been a historical pattern of racial issues in the HR team, including mistreatment of people of color.

27.     Mr. Romero later raised this with Ms. Bass and Mandi Payne, who denied it.

28.     Mr. Romero later discovered that Ms. Bass had privately told Ms. Jones that he should not have received this information, reinforcing concerns about a culture of racial bias.

29.     Mr. Romero observed ongoing performance issues with his direct reports.

30.     Josh Mathei, a white employee who directly reported to Mr. Romero, had recurring performance problems, including errors in offer letters.

31.     Despite raising these concerns from March 2025, Ms. Bass advised against holding him accountable, instead suggesting spot bonuses.

32.    Mr. Romero noted that other employees of color were held accountable to performance standards, creating an apparent disparity.

33.    Mr. Gulikers, the other direct report, soon began exhibiting inappropriate behavior.

34.    During a June 2025 business trip to Las Vegas, Mr. Romero observed Mr. Gulikers making sexualized comments, including referencing FP&A partners and using the acronym 'WAP' inappropriately during meetings.

35.    As well, on at least one occasion, Mr. Gulikers slapped Mr. Romero's buttocks during ping pong and frequently encouraged and celebrating inappropriate and offensive sexualized references towards both men and women.

36.    On September 5, 2025, Mr. Romero met with Ms. McReynolds to discuss concerns about Mr. Gulikers's behavior, Ms. Bass's guidance, and external reports regarding Mr. Gulikers's prior misconduct.

37.    Mr. Romero sought advice on managing Mr. Gulikers and ensuring appropriate executive interactions.

38.    Ms. McReynolds instructed Mr. Romero to monitor Mr. Gulikers and address inappropriate behavior.

39.    On September 8, 2025, Ms. McReynolds requested that Mr. Romero forward email evidence from external sources regarding Mr. Gulikers, which he provided in text format without revealing the sources' identities.

40.    Mr. Romero believed the concern was under investigation.

41.    In a subsequent meeting on October 2, 2025, Mr. Romero expressed disagreement with his mid-year review, which criticized his trustworthiness and integrity despite successful project delivery.

42.    During the meeting, Ms. McReynolds dismissed Mr. Romero's concerns, accused

him of fabricating allegations about Mr. Gulikers, and stated she did not trust him.

43.     The issues raised with Mr. Romero's integrity and trustworthiness were completely fabricated and generated solely out of retaliation for raising legal rights to be free from illegal discrimination.

44.     On October 7, 2025, Mr. Romero became ill with strep throat.

45.     While notifying Ms. Bass of his illness, he later received a text from Mr. Gulikers containing a sexual remark.

46.     Before Mr. Romero could raise the incident with Ms. McReynolds, he received an email terminating his employment, citing completely bogus excuses of dishonesty, faking illness, and voluntarily transitioning out of the organization.

47.     Mr. Romero asserts that Ms. McReynolds, Ms. Bass, and Mr. Birwhistle created a hostile work environment, ignored reports of racially insensitive behavior, and retaliated against him for reporting sexual misconduct concerns.

48.     As a survivor of sexual abuse with PTSD, these events significantly impacted his mental health.

49.     Mr. Romero was then terminated on October 8, 2025.

50.     Mr. Romero was terminated for "faking" his illness.  Mr. Romero was not faking his illness.

51.     Mr. Romero's termination was completely pretextual, wrongful, illegal, and based on an inaccurate premise.

## CAUSES OF ACTION
### FIRST CLAIM

**Race Discrimination under 42 U.S.C. 1981, Title VII, and Chapter 21 of the Texas Labor Code**

52.     Plaintiff hereby realleges and incorporates each and every allegation contained in paragraphs 1 through 51 with the same force as though separately alleged herein.

53.     Under 42 USC 1981, 42 USC 1981a, and 42 USC 1981(a), Americans are afforded the right to be free from discriminatory animus based on race.

54.     Under Title VII, 42 USC 2000 et seq., and Chapter 21 of the Texas Labor Code, employees are protected from discrimination on the basis of race.

55.     Plaintiff is Hispanic and identifies as a man of color.

56.     Plaintiff was mistreated based on his race.

57.     Plaintiff was demoted based on his race.

58.     Plaintiff was terminated based on his race.

59.     Plaintiff was subject to a hostile work environment based on his race.

60.     As such, Defendant intentionally and willfully violated Plaintiff's right to be free from discrimination, and owes Plaintiff all front pay, back pay, emotional distress damages, punitive damages, attorney fees, costs, and expenses.

### SECOND CLAIM

**Retaliation under 42 U.S.C. 1981, Title VII, and Chapter 21 of the Texas Labor Code**

61.     Plaintiff hereby realleges and incorporates each and every allegation contained in paragraphs 1 through 51 with the same force as though separately alleged herein.

62.     Under 42 USC 1981, 42 USC 1981a, and 42 USC 1981(a), Americans are afforded the right to be free from discriminatory animus.  Likewise, they are afforded protection from retaliation when they complain about race discrimination.

63.     Under Title VII, 42 USC 2000 et seq., and Chapter 21 of the Texas Labor Code,

employees are protected from discrimination on the basis of race.  Likewise, they are afforded protection from retaliation when they complain about race discrimination.

64.    Plaintiff explicitly complained about being treated differently based on race.

65.    Plaintiff was, almost immediately, subjected to additional harassment as Defendant began making efforts to fabricate a basis to terminate him.

66.    Plaintiff was, almost immediately, terminated for a pretextual reason because of his complaints of discrimination.

67.    As such, Defendant intentionally and willfully violated Plaintiff's right to be free from retaliation, and owes Plaintiff all front pay, back pay, emotional distress damages, punitive damages, attorney fees, costs, and expenses.

### **THIRD CLAIM**

**Gender/Sex Discrimination under Title VII and Chapter 21 of the Texas Labor Code**

68.    Plaintiff hereby realleges and incorporates each and every allegation contained in paragraphs 1 through 51 with the same force as though separately alleged herein.

69.    Under Title VII, 42 USC 2000 et seq., and Chapter 21 of the Texas Labor Code, employees are protected from discrimination on the basis of gender/sex.  This includes unwanted sexual touching, insensitive jokes, and marginalization.

70.    Plaintiff is a man who was mistreated based on his gender/sex.

71.    Plaintiff was subject to a hostile work environment based on gender/sex.

72.    Plaintiff was subjected to offensive, unwanted sexual touching by coworkers.

73.    Plaintiff was subjected to offensive, unwanted sexual jokes by coworkers.

74.    As such, Defendant intentionally and willfully violated Plaintiff's right to be free from discrimination, and owes Plaintiff all front pay, back pay, emotional distress damages, punitive damages, attorney fees, costs, and expenses.

## FOURTH CLAIM

### Retaliation under Title VII and Chapter 21 of the Texas Labor Code

75.     Plaintiff hereby realleges and incorporates each and every allegation contained in paragraphs 1 through 51 with the same force as though separately alleged herein.

76.     Under Title VII, 42 USC 2000 et seq., and Chapter 21 of the Texas Labor Code, employees are protected from discrimination on the basis of gender/sex.  Likewise, they are afforded protection from retaliation when they complain about gender/sex discrimination.

77.     Plaintiff explicitly complained about being treated differently based on gender/sex and being subjected to inappropriate sexual touching and jokes.

78.     Plaintiff was, almost immediately, subjected to additional harassment as Defendant began making efforts to fabricate a basis to terminate him.

79.     Plaintiff was, almost immediately, terminated for a pretextual reason because of his complaints of discrimination.

80.     As such, Defendant intentionally and willfully violated Plaintiff's right to be free from retaliation, and owes Plaintiff all front pay, back pay, emotional distress damages, punitive damages, attorney fees, costs, and expenses.

## FIFTH CLAIM

### Breach of Contract

81.     Plaintiff hereby realleges and incorporates each and every allegation contained in paragraphs 1 through 51 with the same force as though separately alleged herein.

82.     Plaintiff was promised compensation in the form of stock and equity.

83.     Plaintiff was wrongfully terminated and was not given approximately 21,000 shares of stock owed to him.

84.     But for the pretextual termination, Plaintiff would have been able to receive his equity owed to him.

85.     Plaintiff was performing on the contract between he and Defendant, but Defendant refused to, and did not in fact, perform on the contract.

86.     As such, Plaintiff seeks all equities owed to him under the contract, and any and all other relief owed to him.

## REQUEST FOR RELIEF

**WHEREFORE**, Plaintiff respectfully requests the following relief:

A. For the first cause of action, damages for wages and emotional distress, compensatory damages yet to be determined, attorneys' fees, interest, costs and disbursements;

B. For the second cause of action, damages for wages and emotional distress, compensatory damages yet to be determined, attorneys' fees, interest, costs and disbursements;

C. For the third cause of action, damages for wages and emotional distress, compensatory damages yet to be determined, attorneys' fees, interest, costs and disbursements; and

D. For such other and further relief as the Court deems just and proper.


Dated:  Dallas, Texas
March 18, 2026

**HARMAN GREEN**

By: _____
Evan Ricahrdson
Walker G. Harman, Jr.
824 Exposition Ave.,

9

Suite 8
Dallas, Texas 75226
(646) 248-2288
wharman@theharmanfirm.com
erichardson@theharmanfirm.com
*Attorneys for Plaintiff*